**Opinion issued May 7, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-22-00714-CR**

_____

**ELLIOTT JACOBY BAPTISTE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 184th District Court**
**Harris County, Texas**
**Trial Court Case No. 1672403**

---

## O P I N I O N

A jury convicted appellant, Elliott Jacoby Baptiste, of sexual assault. *See*

TEX. PENAL CODE § 22.011(a)(1)(A). He was sentenced to 15 years' imprisonment.

In two issues, Baptiste contends that (1) the evidence is not legally sufficient to

support his conviction, and (2) the trial court erred by denying his motion to testify free from impeachment by prior convictions. We affirm.

## Background

The complainant ("M.T.") testified that, in August 2019, she and her three older sisters, Keiaira, Ania, and Andrea, were at Keiaira's house. Andrea and her four children lived with Keiaira, and Ania lived nearby. Keiaira suggested that M.T. accompany her to a nightclub to celebrate M.T.'s nineteenth birthday the next day. M.T. testified that she did not want to go, but Keiaira insisted. M.T. was nervous because she had never been to a nightclub. She decided to go for only a short time because she had to work the next morning, and she had an infant child.

M.T. got ready in her sister Andrea's room. Andrea and Ania helped M.T. with her hair and make up. M.T. left her infant daughter with Andrea and Ania and went with Keiaira. Keiaira's boyfriend drove the two sisters and his friend, Baptiste, to the club. On the way, M.T. did not interact with Baptiste.

M.T. testified that, on the way to the club, Keiaira pressured her to take an "XO" pill. M.T. did not want to take the drug because she needed to go home and breastfeed her baby. M.T. attempted to give the pill back to Keiaira, but Keiaira would not take it back. M.T. acted as if she had swallowed the pill, but instead, she put it in the back seat pocket.

M.T. testified that she did not drink any alcohol or take any drugs before going into the club. She testified that she drank cranberry juice and water at the club, and she did not remember consuming any drugs or alcohol there. As the night went on, M.T. became dizzy and lightheaded. She went to the bathroom and sat on the floor. Keiaira came to get her, and M.T. told her she wanted to go home. M.T. left the bathroom and went to sit in a booth with Keiaira. M.T. testified that she did not remember details of the night after that point. She testified that she believed Keiaira put drugs in her drink.

The next thing M.T. remembered she was on the carpeted floor of the hallway outside of Andrea's bedroom at Keiaira's house. M.T. felt something heavy on top of her. M.T. gripped the carpet to try to move, but she could not. She was naked below the waist. She could hear a male voice but could not see his face. The person whispered in her ear and asked if she liked it. She felt a man's penis moving in and out of her vagina.

M.T. next remembered a flashlight shining in her face and being woken up by her sister Ania. She remembered Ania pulling her up off the hallway floor outside of Andrea's room and throwing her in Andrea's room. Keiaira, Andrea, and Ania got into a fight, screaming, and throwing things at each other. Andrea gave M.T. some clothes and helped M.T. down the stairs and outside to the curb.

M.T. testified that her memory of the rest of the day is also hazy. She remembered riding in an ambulance and being asked questions at Ben Taub Hospital but not whether she responded to them. Eventually, as the day went on, she started to become more aware. After completing a sexual assault examination at the hospital, she went home to her mother's house.

M.T. testified that at first, she did not return a detective's phone calls about the case. She felt like everyone was blaming her for what had happened. Eventually, she responded, and a detective came to her house. She was shown a photo lineup, and she picked out the person who had assaulted her.

Keiaira also testified at trial. According to Keiaira, M.T., Keiaira, Keiaira's then boyfriend, and Baptiste all consumed alcohol before going to the club. Keiaira's boyfriend drove them to the club, and each of the four took an "XO" pill in the car. Keiaira knew "XO" to be ecstasy. Keiaira testified that Baptiste and M.T. did not interact on the way to or at the club. M.T. sat next to Keiaira in a booth at the club.

Keiaira testified that when they left, M.T. was intoxicated and needed help into the car. On the way home, M.T. was "real slumped" and acting tired. M.T. rested her head on Baptiste's shoulder on the drive home and went to sleep. The jury viewed a recording of a Snapchat video that Keiaira took on the way home

4

from the club. In the video, M.T.'s head is on Baptiste's shoulder. She appears to be asleep.

When they got home, Keiaira gave M.T. blankets and pillows and suggested she sleep in the hallway outside the two upstairs bedrooms. As she went to her bedroom, Keiaira saw Baptiste walking downstairs. She thought he would sleep downstairs.

Keiaira next heard screaming and crying. She walked out of her room to see M.T. in the hallway. M.T. was wailing and had no clothes on below the waist. Baptiste was standing over her with his pants down. Keiaira could tell her sister was hurt. M.T.'s body was "balled up," and the sisters helped her get up. Keiaira and her boyfriend started beating up Baptiste, and he left. Keiaira then got into a fight with Ania and Andrea. According to Keiaira, Ania and Andrea were mad at her because she had taken M.T. to a club and introduced her to Baptiste. One of them called the police, and Keiaira kicked her sisters out of her house.

Ania testified that she lived a few houses down from Keiaira, and she kept M.T.'s infant daughter while M.T. went to the club with Keiaira. The next morning, about 6:00 a.m., Ania went to Keiaira's house to give the baby back to M.T. Ania went upstairs looking for M.T. She found M.T. covered in blankets on the floor in the hallway. A man was lying behind her. M.T. was unresponsive as Ania tried to wake her up. Ania needed M.T. to wake up and take the baby so that

5

Ania could go to school. Then, Ania heard M.T. saying "help me" and could tell her little sister was in trouble. She quickly put M.T.'s baby in the bedroom with Andrea and "yanked" M.T. off the floor. Ania testified that when she did, she separated M.T. from the man who was behind her. She testified that pulling M.T. away removed the man's erect penis from inside of M.T. M.T. was naked from the waist down. The man was wearing his clothes, but his pants were pulled down, exposing his penis. The man immediately left Keiaira's house.

Ania tried to get M.T. to talk but she was unresponsive and not herself. Ania brought M.T. to Andrea for help, and then Ania went to talk to Keiaira about what had happened at the club. Ania was angry at Keiaira. They got into a fight, yelling and shoving each other. The police were called.

Ania and Andrea helped M.T. put on some sweatpants. They attempted to make her vomit, but it did not work. Keiaira ordered all three of them out of her house, and they went to the curb. It was early morning, and the sun was not yet up.

Andrea's testimony was similar to Ania's. Andrea testified that when they found M.T. at the top of the stairs, she was under covers and not awake. M.T. looked very drunk or drugged, and she could not hold her head up. The sisters realized a man was having sex with M.T. He got up and ran out of the house. Andrea then helped M.T. put on some clothes. The father of Andrea's children, who Andrea did not remember arriving at the house, helped M.T. down the stairs

6

and out to the curb. M.T. could not walk on her own. According to Andrea, M.T. could not remember anything, including where her belongings were.

The jury heard from the responding police officer. He testified that he responded to a domestic disturbance call about 6:00 a.m., and he arrived at the house within four minutes. He found M.T. sitting on the curb with her two sisters, Andrea and Ania. The two sisters were concerned about M.T.'s condition. M.T. was confused, appeared to be intoxicated, and could not stand up. M.T. was incoherent and could not provide a statement. She was barely responsive to questions and had no recall. The responding officer also met with Keiaira, who stayed either near the front door or inside the house. She was not cooperative.

M.T. went to the hospital in an ambulance. The father of Andrea's children accompanied M.T. The responding officer followed and stayed with M.T. for hours until the forensic nurse arrived. During the officer's testimony, the jury viewed his body-worn camera video. The video depicts M.T. at the curb, unable to respond and slurring her words. She could not stand. She could barely say her name, and she struggled to tell her sister where her identification could be located.

The jury also saw video of the officer following M.T. to the hospital, and M.T. on a hospital gurney. When a nurse asks her basic questions, M.T.'s responses are slurred. M.T. mostly sleeps or rests on the gurney. She also vomited. The officer was with M.T. for several hours and was never able to get a statement

from M.T. because she remained incoherent. The officer left when the forensic nurse arrived.

The police officer who investigated the case testified. He reviewed the evidence collected by the responding officer, including statements from the sisters, body-worn camera video, and forensic examination details. At one point, the case became inactive because he could not name a suspect. M.T. did not respond to the investigating officer's calls or emails, and Keiaira refused to provide the name of the suspect. The officer testified that this is common in sexual assault investigations, and that sometimes the complainant blames herself.

Eventually, M.T. reached out to the officer and was willing to cooperate in the prosecution of the crime. The case was reactivated. M.T. did not know the name of the person who had assaulted her, but she knew it was her sister's boyfriend's friend. The investigating officer put together a photo array, and, per protocol, had another detective present it to M.T. M.T. identified Baptiste in the photo array. After the identification, the investigating officer obtained a search warrant for a buccal swab. The investigating officer identified Baptiste in the courtroom as the person from whom he obtained the buccal swab pursuant to a search warrant.

A sexual assault nurse examiner testified as to the sexual assault examination ("SANE" exam) conducted on M.T. She testified that when she

encountered M.T. at the hospital, M.T. was sleepy. The nurse testified that M.T. told her that she had been at a party with her sister. M.T. told the nurse that she did not want to drink because she was breastfeeding. A few friends brought her drinks, and she threw up. She did not remember getting home or how she had changed clothes. She remembered her sisters yelling and one of them picking her up and putting her in a room.

M.T. told the nurse that she was concerned something happened. When the nurse asked M.T. what she thought had happened, M.T. closed her eyes, turned to her side, and stopped answering questions. The nurse attempted to wake her up, but M.T. only moaned and mumbled. The nurse instructed M.T. that to continue the exam, M.T. needed to be fully awake and alert. M.T. shook her head no, indicating she wanted to stop the exam. The nurse testified that M.T.'s state at 9:00 a.m. would potentially prevent her from consenting to sex a few hours earlier.

Another sexual assault nurse testified that she completed the SANE exam later in the afternoon at M.T.'s request. M.T. told her that her sister's boyfriend's friend forced his penis into her vagina. M.T. told the nurse that her sister put a pill called "XO" in her drink. The nurse asked M.T. several questions and completed the physical examination for the SANE exam. The nurse described the evidence she collected for the jury, including swabs of various areas of M.T.'s body and a urine sample.

9

A forensic toxicologist testified that M.T.'s urine tested positive for amphetamine, methamphetamine, and delta-9 carboxy THC. He testified to the effects each of these drugs could have on a person. He said that the combination of these drugs could have an intoxicating effect.

A DNA analyst from the Houston Forensic Center testified as to the results of DNA testing comparing Baptiste's buccal swab to swabs taken from M.T. during the SANE exam. The analyst testified that Baptiste could not be excluded as a contributor to the DNA found on M.T.'s perineal area, neck, and breast swabs.

The jury found Baptiste guilty of sexual assault. He was sentenced to 15 years' imprisonment.

## Sufficiency of the Evidence

Baptiste argues that the evidence is not legally sufficient to prove that he lacked M.T.'s consent for sexual intercourse. Specifically, he argues that the evidence is insufficient to establish either that he used physical force or that he knew M.T. was unaware a sexual assault was occurring.

**A.    Standard of Review**

We review a challenge to the sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We examine all the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *Gutierrez v. State*, 668 S.W.3d 46, 49 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd). Our role is that of a due process safeguard, and we consider only whether the factfinder reached a rational decision. *See Malbrough v. State*, 612 S.W.3d 537, 559 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd); *see also Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (observing that reviewing court's role on appeal "is restricted to guarding against the rare occurrence when a fact finder does not act rationally") (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010)).

In a sufficiency review, we consider the "combined and cumulative force" of the circumstances pointing toward guilt. *Clayton v. State*, 235 S.W.3d 722, 778 (Tex. Crim. App. 2007). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor," and "the standard of review on appeal is the same for both direct and circumstantial evidence cases." *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010) (quoting *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)). The trier of fact is the sole judge of the weight and credibility of the evidence. *See Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018). Thus, when performing an evidentiary sufficiency review, we may not reevaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder. *Gutierrez*, 668 S.W.3d at 50. A reviewing

11

court, faced with a record of historical facts supporting conflicting inferences, must presume that the trier of fact resolved any such conflict in favor of the prosecution and must defer to that resolution. *Jackson*, 443 U.S. at 326. When there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006).

A person commits the offense of sexual assault if he, intentionally or knowingly, causes the penetration of the sexual organ of another person by any means, without that person's consent. TEX. PENAL CODE § 22.011(a)(1)(A). The Penal Code sets forth several circumstances in which a sexual act occurs without a person's consent. *See id.* § 22.011(b)(1)–(14). Relevant here, a sexual assault is without consent if "the actor compels the other person to submit or participate by the use of physical force, violence, or coercion" or "the other person has not consented and the actor knows [that] the other person is unconscious or physically unable to resist" or "the other person has not consented and the actor knows [that] the other person is unaware that the sexual assault is occurring." *Id.* § 22.011(b)(1), (3), (5). The jury was charged on these three statutory provisions.

**B.    Analysis**

Baptiste admits to having engaged in sexual intercourse with M.T., but he disputes that he did so without her consent. We note that in his appellate brief, he argues that the evidence is not sufficient because the State did not establish that he

12

used physical force or that he knew M.T. was unaware the sexual assault was occurring. *See* TEX. PENAL CODE § 22.011(b)(1), (5). Baptiste does not address the third manner or means alleged in the indictment. Specifically, Baptiste's brief does not address whether the evidence was sufficient to prove lack of consent because M.T. was unconscious or physically unable to resist. *Id.* § 22.011(b)(3). The jury was charged on three different manner and means of proving lack of consent. The jury need only find one manner and means occurred beyond a reasonable doubt to find that the sexual intercourse was nonconsensual, and the jury did not have to agree on the manner and means by which Baptiste overcame M.T.'s lack of consent. *Brown v. State*, 580 S.W.3d 755, 762–63 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd).

While the State need not prove all three manner and means, the record includes ample testimony for each of them. M.T. testified that she became dizzy while at the club and that her memory became hazy. She testified that she did not remember how she got home. She testified that her first memories after the club are waking up gripping the carpet, trying to move herself, with a man on top of her. She testified that she could not walk on her own out of Keiaira's house and that she has vague memories of being transported to the hospital and responding to the nurse's questions.

M.T.'s sisters testified similarly. Keiaira testified that M.T. was drunk leaving the club and required assistance to walk. She testified that M.T. was asleep on the way home from the club, and the jury saw a Snapchat video showing M.T. slumped over on Baptiste. The sisters testified that when they discovered M.T. and Baptiste in the hallway, M.T. was unresponsive, naked from the waist down, and could not move on her own. The jury saw the responding police officer's body-worn camera video showing M.T.'s incoherence that lasted for much of the day. The medical records from the forensic exam show that M.T. told the nurse that the assailant forced himself inside of her.

The evidence established that M.T. had not consented to sexual intercourse and that Baptiste knew M.T. was unconscious or physically unable to resist or alternatively, that M.T. was unaware the sexual assault was occurring. TEX. PENAL CODE § 22.011(b)(3), (5); *Wilson v. State*, 473 S.W.3d 889, 899 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd (holding jury could infer defendant knew complainant was unaware of sexual intercourse and did not consent when complainant was intoxicated and fell asleep); *see also Flores v. State*, No. 01-20-00213-CR, 2022 WL 961554, at *9 (Tex. App.—Houston [1st Dist.] Mar. 31, 2022) (mem. op., not designated for publication) (holding jury was entitled to find appellant knew during sexual assault that complainant was unconscious, physically unable to resist, or unaware appellant was engaging in sexual intercourse with her

14

when jury heard testimony that complainant did not consent and had "blacked out" due to alcohol consumption), *aff'd*, 679 S.W.3d 695 (Tex. Crim. App. 2023); *Mauldin v. State*, No. 05-09-00513-CR, 2010 WL 936695, at *4 (Tex. App.—Dallas Mar. 17, 2010, pet. ref'd) (mem. op., not designated for publication) (stating jury could reasonably conclude complainant did not consent when she testified that she did not consent to any sexual act with appellant, that she blacked out several times during the evening, and that she awoke to appellant on top of her with his penis inside of her).

There was also sufficient evidence to prove lack of consent by force. TEX. PENAL CODE § 22.011(b)(1). The jury heard testimony that M.T. awoke to the weight of a body on top of her. She testified that she gripped the carpet and tried to move, but she could not do so. Her sisters testified that they heard her wailing as if she was in pain and asking for help. Ania testified that she physically pulled M.T. and Baptiste apart, removing Baptiste's penis from M.T.'s vagina. M.T. told the forensic nurse examiner that the assailant forced his penis inside of her.

To the extent there is any discrepancy between the testimony of the complainant and the other witnesses, we note that the jury was the sole judge of the credibility of the witnesses at trial, and we defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Jackson*, 443 U.S. at 319, *Wilson*, 473 S.W.3d at 899.

15

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the jury could have found beyond a reasonable doubt that the complainant did not consent to the penetration of her sexual organ by appellant. TEX. PENAL CODE § 22.001(a)(1)(A). Accordingly, we hold that the evidence is sufficient to support appellant's conviction for sexual assault.

We overrule Baptiste's first issue.

### Denial of *Theus* Motion

In his second issue, Baptiste contends that the trial court erred by denying his motion to testify free from impeachment examination about his prior convictions (his "*Theus* motion"). Evidence of a witness's prior conviction may be admitted for purposes of impeachment if the crime was a felony or a crime of moral turpitude, and the court determines that the probative value of admitting the evidence of the conviction outweighs its prejudicial effect. TEX. R. EVID. 609(a). The Court of Criminal Appeals has set out a list of non-exclusive factors courts should use to weigh the probative value of a conviction against its prejudicial effect. *See Theus v. State*, 845 S.W.2d 874, 880 (Tex. Crim. App. 1992). Such factors include (1) the impeachment value of the prior crime, (2) the temporal proximity of the past crime relative to the charged offense and the witness's subsequent criminal history, (3) the similarity between the past crime and the charged offense, (4) the importance of the witness's testimony, and (5) the

16

importance of the witness's credibility. *Id.* Baptiste contends that, according to the *Theus* factors, the prejudicial effects of his prior convictions outweigh their probative value for impeachment, and thus, the trial court denied his motion in error.

The convictions addressed with the trial court included the following: January 2016 conviction for theft by check, January 2015 conviction for assault of a family member, January 2014 conviction for burglary of a motor vehicle, October 2009 conviction for aggravated robbery. After the court denied Baptiste's motion, Baptiste did not testify, and both sides rested.

Baptiste has not preserved this claim for our review. To preserve for review a claim of improper impeachment with a prior conviction, the defendant must testify. *Jackson v. State*, 922 469, 479–80 (Tex. Crim. App. 1999) (following *Luce v. United States*, 469 U.S. 38 (1984)). In *Jackson*, the Court of Criminal Appeals adopted the reasoning in *Luce v. United States* which required the defendant to testify. *Id.* The Court reasoned that otherwise an appellate court "would [be] required to engage in the difficult task of speculating about (1) the precise nature of the defendant's testimony, (2) whether the trial court's ruling would have remained the same or would have changed as the case unfolded, (3) whether the government would have sought to impeach the defendant with the prior conviction, (4) whether the accused would have testified in any event, and (5) whether any

17

resulting error in permitting impeachment would have been harmless." *Jackson*, 992 S.W.2d at 479–80; *Marett v. State*, 415 S.W.3d 514, 516 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (applying *Jackson* and *Luce* and holding defendant who did not testify yet made bill of exception denying he committed the underlying crime of previous conviction did not preserve issue for appellate review). To avoid such difficulties, the error is preserved only if the defendant testifies. *Jackson*, 992 S.W.2d at 480; *Luce*, 469 U.S. at 43.

Baptiste argues that the error is preserved because he supplied the trial court with an offer of proof. Before the punishment phase of trial began, appellant's trial counsel approached the trial court for a "housekeeping matter." Counsel verified that the trial court denied his *Theus* motion the previous day and then made an oral proffer as to what he anticipated Baptiste's testimony would have been. After the proffer, the parties agreed upon a punishment, and the trial court sentenced Baptiste to fifteen years in prison.

In *Luce*, the Supreme Court anticipated that a defendant who wished to preserve error but who was unwilling to suffer impeachment with a prior conviction might proffer a statement for the record on appeal. *Luce*, 469 U.S. at 41. The Court held that such a proffer was insufficient. *Id.* at 41–42. The Court reasoned that any trial court ruling on a motion to testify without impeachment "is subject to change when the case unfolds" particularly if the actual testimony differs

from the defendant's proffer. *Id.* at 42. "Because it is impossible to conduct a harm analysis if the defendant has not testified, and a rule of automatic reversal would encourage abuse, a defendant must testify subject to cross-examination and possible impeachment to preserve error on appeal." *Marrett*, 514 S.W.3d at 516.

Baptiste did not testify; thus, it is impossible to determine whether the probative value of his testimony would have exceeded its prejudicial effect. Baptiste failed to preserve for appellate review his objection to the admissibility of his prior convictions as impeachment evidence. *Jackson*, 992 S.W.2d at 480. We do not consider Baptiste's challenge to the trial court's denial of his *Theus* motion.

## Conclusion

We affirm the judgment of the trial court.


Peter Kelly
Justice

Panel consists of Justices Kelly, Countiss, and Rivas-Molloy.

Publish. TEX. R. APP. P. 47.2(b).